IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

MICHAEL P. and SHELLIE GILMOR,    )
et al.,                           )
                                  )
                Plaintiffs,       )
                                  )
vs.                               )        Case No.  10-0189-CV-W-ODS
                                  )
PREFERRED CREDIT CORP., et al.,   )
                                  )
                Defendants.       )

ORDER AND OPINION DENYING DEFENDANTS' MOTIONS TO DISMISS

Pending are multiple motions to dismiss, many of which raise similar issues.  For
the following reasons, the motions are denied.

I.  BACKGROUND

A.

This case was filed in Clay County Circuit Court in June 2000, and asserted
claims under the Missouri Second Mortgage Loan Act ("the SMLA") against Preferred
Credit Corporation ("PCC") and others.  Thereafter, the case was removed to federal
court and remanded to state court on four different occasions.  Two notable events
occurred while the case was pending in state court.  First, in January 2003 the state
court certified a plaintiff class consisting of all individuals who obtained a second
mortgage loan from PCC on or after June 27, 1994, and who were required to pay or
finance certain fees.  Second, in March 2004, Plaintiffs filed their Sixth Amended
Petition, which added more defendants.  The Sixth Amended Petition remains Plaintiff's
operative pleading.

In September 2009, the Office of the Comptroller of the Currency closed
Defendant Corus Bank, NA ("Corus Bank") and appointed the Federal Deposit

Insurance Corporation ("FDIC") as receiver. On February 4, 2010, Corus Bank filed a Motion to Substitute, asking that the FDIC be substituted for Corus Bank pursuant to Missouri Rule 52.13(c). On February 26, the case was removed to federal court for a fifth time. On this occasion, the Court denied Plaintiffs' Motion to Remand. <u>See</u> Doc. # 48.

A number of motions to dismiss were pending when the case was removed, and another was filed after the case was removed. In concert, the motions raise the following issues: (1) lack of standing, (2) lack of personal jurisdiction, (3) statute of limitations, and (4) preemption.

<u>B.</u>

After making the loans, PCC sold or assigned them to other entities, many of whom are parties in this case. The assignees pooled these (and other) loans and placed them in trusts. The pools were used to collateralize bonds or other investment instruments that were sold to investors. The borrowers' monthly mortgage payments created a revenue stream from which payments were made to those who bought the mortgage-backed investments. In some cases, the assignees designated a separate entity to process the payments made by mortgagors.

Additional facts will be set forth as necessary in the context of the issues raised by the motions.

II. DISCUSSION

A. Personal Jurisdiction[1]

---

[1]While jurisdictional issues must be addressed first, it is permissible to address personal jurisdiction before addressing subject matter jurisdiction. <u>Ruhrgas AG v. Marathon Oil Co.</u>, 526 U.S. 574, 584-88 (1999). The Court deems it appropriate to do so in this case in the interest of clarity.

## *1. Additional Background*

Defendants seeking dismissal based on lack of personal jurisdiction are listed below, along with their own description of their roles in the underlying transactions:[2]

• Credit Suisse First Boston Mortgage Securities Corporation ("CSFB")
CSFB purchased loans PCC made to homeowners in various states. It then transferred the loans to various trusts, which were used to securitize investments sold by CSFB. CSFB did not make loans to any Missouri residents and does not have offices in Missouri.

• Empire Funding Home Loan Owner Trust 1998-1 and its trustees (U.S. Bank National Association and Wilmington Trust Company)
Empire Trust 1998-1 is a trust containing pools of second mortgages; its trustees are sued solely in that capacity. Empire Trust 1998-1 distributes payments received from the loan servicing company (Ocwen Loan Servicing LLC) to the holders of notes and other instruments backed by the mortgages. It does not directly collect loan payments, nor does it directly enforce any rights against borrowers: those actions are taken by Ocwen on the trust's behalf.

• Preferred Mortgage Trust 1996-1, Preferred Mortgage Trust 1996-2, Preferred Mortgage Trust 1997-1, Saxon Asset Securities Trust 2000-4 and their trustees (Saxon Asset Securities Company and Deutsche Bank Trust Company Americas)
Like the other trusts discussed in this Order, these four trusts exist to provide pools of mortgages to securitize investments, with those investments receiving income from the borrowers' mortgage payments. According to them, the trusts hold mortgage

---

[2]Defendants' self-described roles are provided for context and should not be construed as a finding of accuracy by the Court.

loans, receive income from the mortgage loans, and distribute payments from the servicer to the investors. The trusts do not have offices, employees, or bank accounts in Missouri. The trusts do not collect loans or enforce their rights under the loans directly, but rather act through a loan servicer. Like Empire Trust 1998-1, these trusts attempt to portray their servicers as independent contractors possessing complete and unfettered power to collect loans and enforce mortgagor's obligations.

- Accredited Home Capital, Inc., Accredited Home Lenders, Inc., Ameriquest Mortgage Company, Ameriquest Funding I, Credit-Based Asset Servicing & Securitization, LLC, ("C-BASS"), IMH Assets Corporation, IMPAC CMB Trust Series 2003-5, LaSalle National Bank, Litton Loan Servicing, L.P., and Town and Country Credit Corporation

These Defendants have joined in Trust 1998-1's Motion to Dismiss and offered no factual insight into the basis for their motion.[3] Plaintiffs allege that C-BASS was an intervening assignee that purchased loans from PCC that were then sold to one or more trusts. Litton was a C-BASS subsidiary that serviced loans, was registered to do business in Missouri, and serviced the loan made to Plaintiffs Ted and Raye Ann Varns. LaSalle National Bank was either an assignee, a servicer, or both, and it executed the Deed of Release on behalf of IMPAC Trust 1998-1 for the Gilmors' loan.

## 2. Analysis

In analyzing the issue of personal jurisdiction it is important to bear in mind that the issue of liability is not an issue. The Court should not determine, for instance,

---

[3]Facts were presented in the Reply Suggestions, but the Court agrees with Plaintiffs that the moving defendants were required to provide such information and arguments in their original motion and not wait until the Reply Suggestions were filed. Accordingly, the Motions to Strike (Docs. # 148 and 149) are granted. The Court also notes that the Reply Suggestions would not have altered its decision on the merits.

whether the SMLA states a cause of action against any of the moving defendants, nor should it determine the extent of the remedy that is permitted. The only issue is whether Due Process permits those issues to be resolved in this forum.

There are two broad categories of personal jurisdiction. "Specific jurisdiction refers to jurisdiction over causes of action that 'arise out of' or 'relate to' a defendant's activities within a state." Lakin v. Prudential Securities, Inc., 348 F.3d 704, 707 (8th Cir. 2003) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). "General jurisdiction, on the other hand, refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose." Id. (quotation omitted). General jurisdiction does not require a showing that the defendant in question performed any of the activities described in Missouri's long-arm statute. The Missouri Supreme Court has rejected the argument "that Missouri's long-arm statute is the exclusive means of obtaining jurisdiction over a foreign corporation," and explained that the statute is "intended to expand the reach of the law of the state to authorize jurisdiction over foreign corporations that are not necessarily authorized to do business in the state but whose activities justify personal jurisdiction." State ex rel. K-Mart Corp. v. Holliger, 986 S.W.2d 165, 168 (Mo. 1999) (en banc). However, even before the long-arm statute existed, "a foreign corporation present and conducting substantial business in Missouri was subject to the jurisdiction of [Missouri] courts." Id. at 167. The Eighth Circuit has relied on Holliger to hold that Missouri courts would recognize general jurisdiction and, when it is applied, the cause of action need not arise from any of the acts described in the long-arm statute. Lakin, 348 F.3d at 707-08 & n. 5. Specific jurisdiction is proper "if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities." Steinbuch v. Cutler, 518 F.3d 580, 586 (8th Cir. 2008) (citing Burger King Corp., 471 U.S. at 472)).[4]

_____

[4]If the Court were required to "pigeon-hole" this case into Missouri's long-arm statute, the task could easily be accomplished. Section 506.500.1(4) extends jurisdiction over claims arising from the "use . . . of any real estate situated in this state."

5

The analysis for general and specific jurisdiction starts from the same analytical framework. Missouri's long-arm statute "'authorizes the exercise of jurisdiction over non-residents to the extent permissible under the due process clause, [so] we turn immediately to the question whether the assertion of personal jurisdiction would violate the due process clause.'" Romak USA, Inc. v. Rich, 384 F.3d 979, 984 (8th Cir. 2004) (quoting Porter v. Berrall, 293 F.3d 1073, 1075 (8th Cir. 2002)); see also Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 818 (8th Cir. 1994). The Constitutional analysis requires the Court to consider

> [t]he nonresident defendant's conduct and connection with the forum state [and whether it] should reasonably anticipate being haled into court there, and it is essential that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. Purposeful availment means that the defendant's contacts with the forum state must not be random, fortuitous, attenuated, or the result of unilateral activity of a third person or another party.

Guiness Import Co. v. Mark VII Distributors, Inc., 153 F.3d 607, 614 (8th Cir. 1998) (internal citations omitted); see also Dever v. Hentzen Coatings Inc., 380 F.3d 1070, 1073-74 (8th Cir. 2004). These considerations have resulted in a framework consisting of the following components: "(1) the nature and quality of contacts with the forum state; (2) the quantity of these contacts; (3) the relationship between the contacts and the cause of action; (4) the interest of the forum state; and (5) the convenience of the

---

Real estate is being "used" to secure the payment of loans, and with that security comes the right to foreclose on the real property if the loan payments – principal and interest – are not paid. Thus, the real estate is used to secure the interest payments that are at issue in this suit. Through their agents, the trusts have also transacted business within the meaning of section 506.500.1(1). E.g., Aldein v. Asfoor, 213 S.W.3d 213, 216-17 (Mo. Ct. App. 2007) (transaction of business is broad concept and includes transactions made on defendant's behalf by an agent); Shouse v. RFB Const. Co., 10 S.W.3d 189, 193-94 (Mo. Ct. App. 1999) (conducting business in Missouri means that the defendant "manages and directs its economic activities to earn a livelihood by handling and maneuvering those affairs toward a desired result, and that their economic activity occurs in Missouri.").

parties." <u>Wines v. Lake Havasu Boat Mfg.</u>, 846 F.2d40, 42 (8th Cir. 1988).  The third of these factors is the only distinguishing feature between general and specific jurisdiction: a significant relationship between the defendant's contacts and the cause of action reduces the need for a strong showing of the other factors, and an insignificant (or absent) relationship elevates the need for a strong showing of the other factors.  <u>Cf</u>. <u>Wells Dairy, Inc. v. Food Movers Int'l, Inc.</u>, 607 F.3d 515, 518 (8th Cir. 2010) (citing <u>Bell Paper</u>, 22 F.3d at 819).  The first three factors are of primary importance.  <u>E.g.</u>, <u>Austad Co. v. Pennie & Edmonds</u>, 823 F.2d 223, 226 (8th Cir. 1987).  Ultimately, "[t]he existence of personal jurisdiction . . . depends upon . . . a sufficient connection between the defendant and the forum State to make it fair to require defense of the action in the forum."  <u>Kulko v. Superior Court of Cal.</u>, 436 U.S. 84, 91 (1978).

In applying these factors, the Court rejects certain arguments advanced by Plaintiffs.  First, Plaintiffs rely on their claim that these defendants are derivatively liable based on PCC's actions.  They reason that these defendants are subject to personal jurisdiction simply because PCC was subject to personal jurisdiction.  The Court does not believe this theory to be valid because each defendant's contacts must be considered separately.  <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 781 n.13 (1984).  These defendants may be liable simply because they bought the loans from PCC, <u>see</u> <u>Schwartz v. Bann-Cor Mortgage</u>, 197 S.W.3d 168, 179 (Mo. Ct. App. 2006), but this does not mean they can be sued in any forum in which PCC could be sued.  Similarly, while the Home Ownership and Equity Protection Act ("HOEPA") subjects assignees to certain defenses that could be asserted against the original lender, <u>see</u> 15 U.S.C. § 1641(d), the statute does not dictate <em>where</em> the assignee will be subject to a suit asserting those defenses.  Second, Plaintiffs rely on cases and theories applicable to successors in interest, which are inapplicable because these defendants are not PCC's successor(s) in interest.  They are assignees, but the fact that they are assignees does not automatically make them subject to jurisdiction in this forum.  <u>E.g.</u>, <u>Purdue Research Foundation v. Sanofi-Sythelabo, S.A.</u>, 338 F.3d 773, 783-84 (7th Cir. 2003) (differentiating between a successor in interest and an assignee for purposes of evaluating personal jurisdiction).  Finally, Plaintiffs emphasize Defendants' knowledge

that the loans made to Missourians would be governed by Missouri law.  Even if this contention is true, it does not establish that Missouri is the appropriate forum to apply that law.

## (a) The Trusts

All the trusts knew in advance (1) that they assumed contracts with Missouri residents and (2) that the loans were secured with Missouri real estate.  These facts do not automatically subject the trusts to jurisdiction, but this circumstance constitutes contact with the forum state.  The trusts also accepted loan payments from Missouri residents.  The trusts downplay these contacts, insisting they did not have any contact with the debtors but instead contracted with servicing companies to engage in the collecting and enforcement tasks.  For instance, Empire Trust 1998-1 argues that its servicing agent "is an independent contractor.  That is, there is no agency relation between or among them."  This statement makes no sense: an independent contractor *is* an agent.  Moreover, just because the parties have agreed between themselves to label one of them an "independent contractor" does not mean it is an accurate description of the parties' relationship.  Ultimately, this fact is irrelevant because the right to receive payment was possessed at all times by the trusts.  The trusts (and, to a lesser extent, the other Defendants) seem to argue that the various ownership interests and rights accorded to the lender have been divided among so many entities that no one of them has sufficient contact with the state where the lender and security are found.  The Court finds the argument unpersuasive.  "In determining whether 'minimum contacts' exist, contacts with the forum state that are made on behalf of the defendant by others may be considered."  Digi-Tel Holdings, Inc. v. Protec Telecommunications (PTE), Ltd., 89 F.3d 519, 523-24 (8th Cir. 1996) (emphasis deleted); see also Burger King Corp., 471 U.S. at 480 n.22.  The servicing agents did not collect loan payments and keep them: they collected loan payments, kept a portion as payment for their services, and remitted the balance to the trusts.  Thus, whether on their own or through others acting on their behalf, the trusts have purposely directed activity into Missouri to

collect and enforce the loans.  The nature of the loans as second mortgages is also significant, as the trusts (on their own or through others designated to act for them) would reasonably expect to be involved in litigation in Missouri to enforce their rights.

The trusts characterize their involvement in Missouri as insignificant because the Missouri loans constitute only a small portion of their assets.  This is not a proper consideration.  "Percentage of a company's sales in a given state are generally irrelevant.  Instead, our focus is on whether a defendant's activity in the forum state is continuous and systematic."  Lakin, 348 F.3d at 709 (quotation omitted).  Relevant considerations include the value of the loans in Missouri, the duration of the relationship (measured by the length of the second mortgages), and the fact that the trusts "have liens on . . . real property in Missouri and the power to use Missouri courts to enforce them."  Id. at 709-10.[5]  Finally, the Court observes that the claims against the trusts arise from the aforementioned contacts with Missouri: the suits challenge the collectability of interest on the loans, and the trusts (on their own or through designated intermediaries) routinely collect interest.  It is also fair to presume that the trusts will continue to collect interest if Plaintiffs do not prevail in this suit.  These contacts are not sporadic, insignificant, or fortuitous, and they represent the core functions of the trusts' business/purpose.

The preceding paragraphs address the first three – and the most important – considerations in assessing a defendant's contacts, and the discussion leads to the conclusion that requiring the trusts to defend this suit in Missouri is consistent with Due

---

[5]The Record suggests Empire Trust 1998-1has as many as 170 loans secured by Missouri real estate with an aggregate principal value of over $6.3 million.  The Record is less clear for the Preferred Mortgage Trusts, but it appears Trust 1996-1 has as many as twenty-nine Missouri loans and that Trusts 1996-2 and 1997-1 has 136 Missouri loans between them.  The value of these loans is also not clear.  Finally, the Record is not entirely clear as to IMPAC Trust 2003-5's holdings, but it appears to have had as many as forty-four Missouri loans with an aggregate value of approximately $8 million.  No information is available with respect to the other trusts.  The Record does not indicate whether any of the trusts (or their agents) have availed themselves of Missouri courts in order to enforce loan obligations or foreclose on real estate.  Given what the Court knows about the status of discovery, the Record's lack of clarity appears to be attributable to Defendants.

Process.  The Court also notes the final two factor augur in favor of that conclusion. Missouri has a strong interest in providing a forum for its citizens, particularly with respect to litigation designed to protect consumers.  That interest is strengthened here because the suits affect the value of liens on real estate.  Finally, the Court discerns no unfairness to the trusts in requiring them to defend suits here.  As stated, they put themselves in a position in which they might be required to utilize Missouri courts in the event a borrower defaults.  The fact that a trust designated an agent to take that action on its behalf is of no significance.

## (b) The Loan Servicers

The loan servicers were actually involved in the collection and enforcement of loans on behalf of one or more trusts, and this activity constitutes a contact justifying the assertion of jurisdiction over them.  The servicers directed communications into Missouri to collect on the loans in question, received money from Missouri residents, and took other actions necessary to enforce and collect on the loans.  In addition, the Court notes that Litton is registered to do business in Missouri.

## (c) Intervening Assignees

Intervening Assignees (such as CSFB) contend they owned the loans for such a short period of time that it is unfair to subject them to suit in Missouri.  The length of ownership is a factor in evaluating whether contacts are systematic and continuous, but the Court believes the intervening assignees are still subject to suit in this forum.  The nature of the contacts involved entering contracts (1) with borrowers known to live in Missouri and (2) with loans secured by Missouri real estate.  Plaintiffs' claims against the assignees arise from those contacts with Missouri.  It may be that their ownership of the loans was so brief that they are not subject to liability, but Due Process is not violated by requiring the assignees to defend the suit in Missouri.

Several Defendants allege they have never had any ownership interest or other involvement in the named Plaintiffs' loans, so they should be dismissed because the named Plaintiffs lack standing to sue them.  As an initial matter, the Court notes that revelations made during the course of discovery have demonstrated that some of the moving defendants actually do (or did) have an interest or involvement in a named Plaintiff's loans.  The Court is also aware that discovery regarding the ownership history of the Plaintiffs' loans was not completed at the time these motions became fully briefed and, in fact, may still not yet be completed.  Therefore, the Court is reluctant to dismiss any Defendant even if the standing argument has legal merit.[6]

The Court rejects Plaintiffs' argument that the issue was resolved by the state court prior to removal.  Standing is a jurisdictional concept comprised of an "irreducible constitutional minimum" dictated by Article III as well as prudential considerations.  E.g., Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591-92 (8th Cir. 2009).  The state court was not required to, and did not, consider Article III in the course of deciding any issues involved in this suit.  This Court has an independent obligation to evaluate its jurisdiction, and this includes addressing issues related to standing.  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230-31 (1990).[7]

The constitutionally-mandated minimum requirements for standing are a showing of (1) injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that can likely be redressed through judicial action.  E.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  These requirements are easily and obviously met with respect to those who own or owned Named Plaintiffs' loans – the Plaintiffs were allegedly charged

---

[6]In their Reply Suggestions, some Defendants – faced with information suggesting they were involved in one or more Named Plaintiff's loans – presented a new argument contending they should be dismissed because they did not violate the SMLA.  This argument was not raised, and is not related to the standing argument that was raised, in the initial briefing and will not be addressed.

[7]There is no need to consider whether the state court had jurisdiction.  28 U.S.C. § 1441(f).

excessive or improper fees and, as a result, are allegedly being required to pay interest they should not have to pay. Those who owned or own the loans collected interest or demand that interest be paid to them. The Court can remedy Plaintiffs' harm through an appropriate order and judgment. Defendants who have no connection to the Named Plaintiffs' loans contend the traceability requirement cannot be satisfied, but this argument ignores the fact that the class was certified before these Defendants were brought into the suit

When a class is certified, "the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by" the class representatives. Sosna v. Iowa, 419 U.S. 393, 399 (1975). Thus, in Sosna, the Court held a district court did not lose jurisdiction over the claims asserted by a properly certified plaintiff class even though the representative's claims became moot after the class was certified because the class is an entity separate and apart from the class representative. Bishop v. Committee on Professional Ethics & Conduct of Iowa, 686 F.2d 1278, 1285 (8th Cir. 1982). The concept recognized in Sosna – that a class has an existence separate and apart from the representative – applies in other jurisdictional contexts, including standing. E.g., Payton v. County of Kane, 308 F.3d 673, 680-81 (7th Cir. 2002); Lynch v. Baxley, 651 F.2d 387, 388 (5th Cir. Unit B July 1981).[8] As explained by the Seventh Circuit,

> once a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs. The certification of a class changes the standing aspects of a suit, because a properly certified class has a legal status separate from and independent of the interest asserted by the named plaintiff.

Payton, 308 F.3d at 680 (citations omitted); see also Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999) ("[T]he class certification issues are . . . logically antecedent to Article III concerns, and themselves pertain to statutory standing, which may properly be

---

[8]This may be due to the fact that standing and mootness both arise from Article III's requirement that there be a case or controversy. E.g., DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

treated before Article III standing.  Thus, the issue about Rule 23 certification should be treated first, mindful that the Rule's requirements must be interpreted in keeping with Article III constraints." (quotations omitted)).  Numerous courts of appeal have relied on this principle to approve class actions where the claims stem from a common origin but some of the defendants have not had the same interaction with each class member. E.g., Payton, 308 F.3d at 675-76, 680 (plaintiff class could be permitted to challenge bail fees charged by various counties, even though the named plaintiffs did not have a claim against all counties named as defendants); Moore v. Comfed Sav. Bank, 908 F.2d 834, 836,  (11th Cir. 1990) (plaintiff class permitted to assert usury claims against defendants who purchased loans from original lender in the secondary market, even though not all defendants owned loans made to named plaintiffs); see also Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 423-24 (6th Cir. 1998) (common issue regarding policies of ERISA administrator sufficient to confer standing, even though not all class members were participants in the same plan); Forbush v. J.C. Penney Co., 994 F.2d 1101, 1106 (5th Cir. 1993) (common issue regarding employer's overestimation of social security benefits sufficient to confer standing, even though four different pension plans were involved).

Several circuits relying on the "class is an entity" theory for jurisdictional purposes advocate the designation of new or additional class representatives in order to further "cure" the potential jurisdictional problem.  E.g., Wiesmueller v. Kosobucki, 513 F.3d 784, 786 (7th Cir. 2008) ("The named plaintiff who no longer has a stake may not be a suitable class representative, but that is not a matter of jurisdiction and would not disqualify him from continuing as class representative until a more suitable member of the class was found to replace him."); Lynch, 651 F.2d at 388 (district court erred in dismissing suit when class representative lost standing without affording class members an opportunity to select new representative); but see Hargrave v. Vermont, 340 F.3d 27, 34 n.6 (2d Cir. 2003) (declining to require naming of new class representative when original representative "lost" standing).

In this case, the Court deems it prudent to include additional representatives to help insure that the requirements of Rule 23 are met.  The Court recognizes that

Plaintiffs cannot accomplish this task until Defendants produce the loan histories, which will tell Plaintiffs (1) which Defendants necessitate the inclusion of additional representatives and (2) which class members are qualified to be additional representatives. Therefore, the Court will require Plaintiffs to file an appropriate motion to designate additional representatives on or before March 31, 2011.

## C.  Statute of Limitations

CSFB contends the named Plaintiffs' claims against it are time-barred.  Each of the named Plaintiffs' loans were made in 1997, and CSFB alleges it purchased and sold the loans in 1997 as well.  CSFB was not a defendant when this suit was originally filed in June 2000, but was added in the Third Amended Petition filed in June 2001.  Plaintiffs voluntarily dismissed CSFB without prejudice in March 2002, but re-added CSFB in the Sixth Amended Petition filed in March 2004.

The SMLA imposes a penalty or forfeiture, so claims under that statute must be brought "within six years after the discovery by the aggrieved party of the facts upon which such penalty or forfeiture attached, or by which such liability was created."  Mo. Rev. Stat. § 516.420; see also Schwartz, 197 S.W.3d at 175-78 (holding that section 516.420 applies to SMLA claims).  The limitation period was not tolled from March 2002 to March 2004 because the claims against CSFB were dismissed without prejudice. E.g., Wittman v. National Supermarkets, Inc., 31 S.W.3d 517, 520 (Mo. Ct. App. 2000); Hehner v. Hehner, 918 S.W.2d 283, 284-85 (Mo. Ct. App. 1996).  CSFB's argument rests on the premise that the claims against it accrued in 1997, making the assertion of those claims in 2004 untimely.  The Record does not presently permit the Court to accept the underlying premise.

Plaintiffs contend[9] they "weren't even aware CSFB had anything to do with the tainted loans until they were provided with information revealing the identity of CSFB in 2001." Suggestions in Opposition (Doc. # 101) at 10. Thus, they argue, their claims did not accrue until 2001, making their claims asserted in 2004 timely. Plaintiffs do not explain their lack of knowledge, and CSFB does not dispute it – instead, CSFB argues Plaintiffs' lack of knowledge is irrelevant because they knew the facts giving rise to the SMLA claim. The Court rejects this narrow interpretation of section 516.420. As a general rule, a cause of action accrues when damages are capable of ascertainment. Business Men's Assurance Co. v. Graham, 984 S.W.2d 501, 507 (Mo. 1999) (en banc). This rule works well when the wrongdoer is known or apparent – but in a complicated financial transaction such as this, it is plausible that while Plaintiffs knew they had suffered damage they did not know the ownership history of their loans and, hence, did not know all the entities from whom redress could be retained. CSFB's involvement in their loans was a "fact" necessary to the imposition of a penalty or forfeiture against CSFB. If that fact was not known until 2001, then the cause of action did not accrue until 2001. Unfortunately, the present Record does not support a finding one way or the other on this issue, so CSFB's request for dismissal must be denied. The issue can be reasserted at summary judgment if the Record warrants.[10]

_____

[9]The Court expressly rejects three of Plaintiffs' arguments. First, Plaintiffs contend their claims against CSFB (and others) are timely because the claims asserted against PCC were timely. The Court does not agree that Schwartz supports this proposition. Second, Plaintiffs contend the limitation period was tolled because they sought certification of a defendant class. The law generally supports the idea that the limitation period is tolled when claims are asserted against a defendant class, but a defendant class has never been certified. Plaintiffs first provided allegations supporting a defendant class in their initial petition in June 2000, but apparently never formally sought certification. Plaintiffs' lack of diligence in this regard precludes their ability to rely on the benefits of a non-existent defendant class. Finally, the relation-back doctrine is not implicated by the events in this case.

[10]The Court notes a potential argument that was not raised by either party. It may be that each loan payment incorporating the illegal fees is a separate, continuing violation, such that a suit is timely with respect to any loan payment made within the six years preceding suit. There is no present need to determine whether this theory applies

<u>D. Preemption</u>

Ocwen and Sovereign Bank contend Plaintiffs' claims are preempted by the Home Owners' Loan Act (HOLA), 12 U.S.C. § 1461 *et seq*. The Court disagrees.

Defendants' arguments are similar to those addressed by the Court in the context of the National Bank Act ("NBA") when Defendants attempted to remove this case in 2004. Then, federal jurisdiction was alleged to exist because the NBA completely preempted the field of regulating usury claims against national banks. The undersigned rejected the argument, noting that claims against a bank's lending practices were preempted, but the banks had not made the loans in question. The Order also noted a large number of other courts and judges agreeing with this position. <u>Gilmor v. Preferred Credit Corp.</u>, No. 04-0255 (Dec. 20, 2005) (Docket # 206).[11] Curiously, Defendants have made no effort to distinguish the NBA from HOLA, nor have they suggested any reason why the Court should reach a different conclusion now. Indeed, the regulation referenced by Defendants specifies that it is intended to "occup[y] the entire field of *lending regulations* for federal savings associations." 12 C.F.R. § 560.2(a) (emphasis supplied). The regulation then declares that "federal savings associations may *extend credit* as authorized by federal law . . . without regard to state laws purporting to regulate or otherwise affect their credit activities . . . ." <u>Id</u>. (emphasis supplied). Defendants also point to 12 U.S.C. § 1463(g), which preempts state usury laws – and present the precise argument the Court rejected previously. Section 1463 governs the interest charged "on any extension of credit," but in this case Ocwen and Sovereign Bank did not extend credit. Finally, Defendants argue they are entitled to purchase loans and other assets, which is true – but they have not identified any law preempting

---

to the SMLA.

[11]The Eighth Circuit has held the NBA preempts SMLA claims against federally chartered national banks. <u>Phipps v. FDIC</u>, 417 F.3d 1006 (8th Cir. 2005). However, the banks in that case originated the loans, so <u>Phipps</u> does not alter the Court's reasoning and is not implicated in this case.

state claims against them when they act in the capacity of a loan purchaser as opposed to a loan originator or loan servicer.[12]

## E.  HOEPA

Ocwen contends it cannot be liable under HOEPA because it is a loan servicer and HOEPA does not impose liability on a servicer "unless the servicer is or was the owner of the obligation."  15 U.S.C. § 1641(f).  The Court declines to dismiss Ocwen for two reasons.  First, this is not a motion for summary judgment, and the pleadings do not establish that Ocwen's invovlement in the loans is only as a servicer.  Ocwen may be correct, but it must present the argument under Rule 56.  Second, even if HOEPA does not impose liability, Ocwen has not demonstrated that the SMLA also does not impose liability.

Ocwen may ultimately prevail on this argument.  At present, the Court cannot determine Plaintiffs have failed to allege a viable claim.

## III.  CONCLUSION

For these reasons, all of Defendants' motions to dismiss are denied.  Plaintiffs are directed to file an appropriate motion to designate additional representatives on or before March 31, 2011, as discussed in Part II.B.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: January 13, 2011              UNITED STATES DISTRICT COURT

---

[12]Sovereign Bank also addresses the underlying purposes of HOLA preemption, which is to insure that financial institutions can lend money and make other financial products available.  Ironically, Sovereign Bank did not lend money or make other financial products available.