IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

MICHAEL P. AND SHELLIE GILMOR,
  et al.,

                  Plaintiffs,

vs.

PREFERRED CREDIT CORPORATION,
  et al.,

                  Defendants.

Case No. 10-0189-CV-W-ODS

———————————————

**PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO
DEFENDANT LITTON LOAN SERVICING LP'S
MOTION FOR SUMMARY JUDGMENT**

———————————————

WALTERS BENDER STROHBEHN
 & VAUGHAN, P.C.

By    */s/ Kip D. Richards*
   R. Frederick Walters – Mo. Bar 25069
   Kip D. Richards – Mo. Bar 39743
   David M. Skeens – Mo. Bar 35728
   Karen W. Renwick – Mo. Bar 41271
   J. Michael Vaughan Mo. – Bar 24989
   Garrett M. Hodes – Mo. Bar 50221
   Matthew R. Crimmins – Mo. Bar 53138
   Bruce V. Nguyen – Mo. Bar 52893
   2500 City Center Square
   1100 Main Street
   P.O. Box 26188
   Kansas City, MO 64196
   (816) 421-6620
   (816) 421-4747 (Facsimile)

ATTORNEYS FOR PLAINTIFFS/
 CLASS COUNSEL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... iii

INTRODUCTION.................................................................. 1

I.    RESPONSE TO DEFENDANT'S STATEMENT OF ALLEGEDLY UNCONTROVERTED MATERIAL FACTS. .................................... 2

II.   ADDITIONAL UNDISPUTED FACTS PRECLUDING THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANT LITTON LOAN SERVICING............................................................... 14

III.  ARGUMENTS AND LEGAL AUTHORITIES............................... 20

    A.    SUMMARY JUDGMENT STANDARD ........................... 20

    B.    A REASONABLE JURY CAN READILY CONCLUDE THAT THE LOANS LITTON ADMITTEDLY SERVICED VIOLATED THE MSMLA IN THAT ONE OR MORE FEES NOT AUTHORIZED BY § 408.233.1 RSMo WAS CHARGED, CONTRACTED FOR OR RECEIVED IN CONNECTION WITH THE LOAN. ..................... 20

    C.    PLAINTIFFS' MSMLA CLAIMS AGAINST LITTON ARE NOT TIME-BARRED.................................................. 22

         1.    The Six-Year Statute Provided in § 516.420 Applies to Plaintiffs' MSMLA Claims Against a "Moneyed Corporation" like Litton......................................................... 22

         2.    Litton is a "Moneyed Corporation" to Which The Six-Year Statute of Limitations in § 516.420 RSMo Applies as a Matter of Law.......................................................... 23

         3.    Plaintiffs' Claims Are An Action On A Penal Statute.......................... 26

         4.    Even if the Contested Three-Year Statute Applies, Plaintiffs' MSMLA Claims Against Litton are not Barred by Limitations Because Plaintiffs Paid Interest and Principal on their PCC-Made Loans Within the Contested Three-Year Period and a Cause of Action Arising From the Violation of the MSMLA Accrued Each Time Interest and Principal was Charged and Received on the Loans. .......................................... 26

D.     **A LOAN SERVICER DIRECTLY VIOLATES THE MSMLA WHEN IT EITHER RECOVERS INTEREST PAYMENTS OR CHARGES AND/OR RECEIVES FINANCED LOAN FEES FROM BORROWERS** ................................................................................27

E.     **A REASONABLE JURY CAN READILY CONCLUDE THAT LITTON'S FAILURE TO ASCERTAIN WHETHER THE LOANS IT SERVICED COMPLIED WITH THE MSMLA ENTITLES PLAINTIFFS TO PUNITIVE DAMAGES AGAINST LITTON.** ................29

F.     **PLAINTIFFS WILL NOT ASSERT A CLAIM AGAINST LITTON FOR CONSPIRACY, JOINT VENTURE OR PARTNERSHIP AT TRIAL.** ........................................................................................30

**IV.     CONCLUSION** ................................................................................30

**CERTIFICATE OF SERVICE** ................................................................31

# TABLE OF AUTHORITIES

<u>CASES</u>

*CWCapital Asset Management, LLC v. Chicago Properties, LLC*,
   610 F.3d 497, 499-501 (7th Cir. 2010) ...............................................................................*passim*

*Division of Labor Standards v. Walton Construction Management Co., Inc.*,
   984 S.W.2d 152 (Mo.App.W.D. 1998) ......................................................................................26

*Mitchell v. Residential Funding Corp.*,
   334 S.W.3d 477 (Mo. App. 2010) .......................................................................................28, 29

*Rashaw v. United Consumers Credit Union*,
   685 F.3d 739 (8th Cir. 2012) .......................................................................................22, 23, 26

*Schwartz v. Bann-Cor Mortgage* ,
   197 S.W.3d 168 (Mo. App. 2006) ..................................................................................22, 23, 26

*Washington v. Countrywide Home Loans, Inc.*,
   655 F.3d 869 (8th Cir. 2011)...................................................................................................28


<u>FEDERAL STATUTES, RULES, MISC.</u>

15 U.S.C. § 1641(d) ......................................................................................................................27

15 U.S.C. §1641(f)(HOEPA) ........................................................................................................29


<u>STATE STATUTES, RULES, MISC.</u>

§ 361.020.1 RSMo .........................................................................................................................24

§ 381.410(b) RSMo........................................................................................................................25

§ 408.232.1 RSMo ...................................................................................................................28, 29

§ 408.233.1 RSMo ...................................................................................................... 21, 22, 28, 29

§ 408.236 RSMo ............................................................................................................................28

§ 408.562 RSMo ............................................................................................................................29

§ 443.800-443.893 RSMo 2000.....................................................................................................24

§ 443.801.1(19) RSMo ................................................................................................24

§ 443.801.3(8)(j) 2000 ..............................................................................................24

§ 443.803.1(8) RSMo ................................................................................................24

§ 443.805.1 RSMo 2000 ............................................................................................24

§ 443.812.2 RSMo .....................................................................................................24

§ 443.855 RSMo ........................................................................................................24

§ 443.861 RSMo ........................................................................................................24

§ 443.885 RSMo ........................................................................................................24

§ 443.908.1(19) RSMo ..............................................................................................25

§ 516.130(2) RSMo ....................................................................................................22

§ 516.380 RSMo ........................................................................................................26

§ 516.420 RSMo .............................................................................................. 22, 23, 26

## INTRODUCTION

The Court should deny Defendant Litton Loan Servicing, LP's Motion for Summary Judgment (Doc. 677). It is undisputed that Litton serviced 80 of the Class Members' second mortgage loans. (**R-UF ¶¶10, 17, 27, 28; AF ¶¶3-8, 12-13, 16-27**) As to those loans where Plaintiffs have identified the fees charged at closing, it is undisputed that Litton also charged and received interest on the loans. (**R-UF ¶¶10, 17, 27, 28; AF ¶¶3-8, 12-13, 16-27**) Thus, as to those loans, Litton directly violated the MSMLA and is liable under Missouri law to those Class Members. Therefore, its motion for summary judgment as to these 74 loans should be denied.

As to the 6 Class Member loans with missing HUD-1 Settlement Statements or other closing cost information, Plaintiffs' evidence presents a *prima facie* question for the jury as to whether those loans contained one or more financed settlement charges that Plaintiffs assert were illegal. (**R-UF ¶¶ 26, 41; AF ¶¶29-32**) Indeed, Plaintiffs' analyses demonstrate, their expert concludes, and the lender, PCC, admits, that illegal "loan processing" and "underwriting" fees were charged, contracted for and received on every single one of the Class members' loans regardless of the assignee, trustee, or loan servicer. If the jury's finding as to that core question of liability based upon this evidence is favorable to the Plaintiffs, then Litton is liable as a matter of Missouri law to the Class Members as to those 6 loans. Thus, its motion for summary judgment as to these 6 loans should also be denied.

Whether Litton's conduct warrants the imposition of punitive damages is also a question for the jury to decide. At the time it was servicing the Class Members' loans, Litton made no effort to confirm whether its servicing of the loans – and its collection of interest on the loans – complied with Missouri law, including the MSMLA. (**AF ¶¶9-11**) Under Missouri law, whether this type of conduct is outrageous or in reckless disregard of the Class Members' rights presents

a sufficient question for resolution by the jury, such that Litton's motion as to Plaintiffs' punitive damages claims should be denied.

For all of these reasons, and for those in Plaintiffs' Motion for Partial Summary Judgment (Doc. 703-704) and in Plaintiffs' Suggestions in Opposition to Wilmington Trust Company's Motion for Summary Judgment, both of which are incorporated herein, Litton's Motion for Summary Judgment should be denied.

I. **RESPONSE TO DEFENDANT'S STATEMENT OF ALLEGEDLY UNCONTROVERTED MATERIAL FACTS.**

1. Plaintiffs Michael and Shellie Gilmor filed their Original Petition in the Circuit Court of Clay County, Missouri on June 27, 2000 asserting claims that Preferred Credit Corporation ("PCC") and others were liable under the MSMLA. Litton was not named as a defendant in the suit. (Ex. A, Original Petition, pp 3–7.)

> **RESPONSE: Disputed. Although not specifically identified by name, Litton was named as a "Doe Defendant" and as a member of the "Defendant Second Mortgage Class" alleged in the petition. Exhibit FF (Plaintiff's Original Petition), at ¶¶6-7, 40-47.**

2. Five Amended Petitions were then filed but Litton was not named as a party in any of them. (Ex. B, amended petition captions.)

> **RESPONSE: Disputed. Although not specifically identified by name, Litton was named as a "Doe Defendant" and as a member of the "Defendant Second Mortgage Class" alleged in each of the amended petitions.**
>
> **Exhibit GG (Plaintiff's First Amended Petition), at ¶¶7-8, 41-47; Exhibit HH (Plaintiff's Second Amended Petition), at ¶¶7-8, 41-47; Exhibit II (Plaintiff's Third Amended Petition), at ¶¶22-23, 58-65; Exhibit JJ (Plaintiff's Fourth Amended Petition), at ¶¶26-27, 74-81; Exhibit KK (Plaintiff's Fifth Amended Petition), at ¶¶28-29, 76-83.**

3. On March 3, 2004, plaintiffs filed their Sixth Amended Petition naming Litton as a

2

defendant for the first time. (Ex. C, Sixth Amended Petition caption.)

> **RESPONSE: Undisputed, but qualified to clarify that Litton had been previously named as a "Doe Defendant" and as a member of the "Defendant Second Mortgage Class." (R-UF, ¶¶1, 2 above)**

4. Litton had no notice of claims made or that might be made against it in this case until it was served with the Sixth Amended Petition. (Ex. D, Declaration of Kevin Flannigan ¶ 43.)

> **RESPONSE: Disputed. The various filings in this lawsuit in and after 2000 provided Litton with the requisite notice. (R-UF, ¶¶1, 2 above)**

5. Plaintiffs are proceeding against Litton under the MSMLA and seek redress for alleged overcharges and improper fees charged at the time of their loans from PCC. (Seventh Amended Complaint, Dkt. No. 258 ¶¶ 89-95.)

> **RESPONSE: Undisputed, but qualified to clarify that Plaintiffs and the Class Members seek to recover both (a) the fees that were "directly <u>or</u> indirectly charged, contracted for <u>or</u> received in connection with" their second mortgage loan in violation of § 408.233.1 RSMo, and (b) the interest that was collected and recovered on those loans in violation of § 408.236 RSMo.**

6. Plaintiffs are seeking damages which include claims for penalties or forfeitures in the form of the return of all interest paid to date, forgiveness of future interest, punitive damages and attorneys' fees. (*Id*. Prayer for Relief.)

> **RESPONSE: Undisputed that Plaintiffs seek, among other things, a return of all interest paid to date, forgiveness of future interest, punitive damages and attorneys' fees. (Operative Complaint, Requested Relief).**

7. The class certified in this case is limited to Missouri residents who allege they obtained residential real estate loans from PCC secured by second mortgages or second deeds of trust. (Ex. E, Order dated Jan. 2, 2003.)

**RESPONSE:  Undisputed that the Order dated Jan. 2, 2003 defines the Class.**

8.    Named plaintiffs Michael and Shellie Gilmor obtained their loan from PCC on October 3, 1997.  (Seventh Amended Complaint, Dkt. No. 258 ¶ 98.)  Plaintiffs allege that PCC charged them unauthorized fees at the time their loan closed.  (*Id*. ¶ 101, 104.)

> **RESPONSE:  Objection.  This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact." Without waiving, and subject to their objections, Plaintiffs will separately address fact below.**
>
> **a.    Undisputed.**
>
> **b.    Undisputed, but qualified to clarify that Plaintiffs and the Class Members seek to recover both (a) the fees that were "directly <u>or</u> indirectly charged, contracted for <u>or</u> received in connection with" their second mortgage loan in violation of § 408.233.1 RSMo, and (b) the interest that was collected and recovered on those loans in violation of § 408.236 RSMo.**

9.    Named plaintiffs Ted and Raye Ann Varns obtained their loan from PCC on August 28, 1997.  (*Id*.¶ 128.)  Plaintiffs allege that PCC charged them unauthorized closing fees at the time their loan closed.  (*Id.* ¶¶ 131, 134.)

> **RESPONSE:  Objection.  This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact." Without waiving, and subject to their objections, Plaintiffs will separately address fact below.**
>
> **a.    Undisputed.**
>
> **b.    Undisputed, but qualified to clarify that Plaintiffs and the Class Members seek to recover both (a) the fees that were "directly <u>or</u> indirectly charged, contracted for <u>or</u> received in connection with" their second mortgage loan in violation of § 408.233.1 RSMo, and (b) the interest that was collected and recovered on those loans in violation of § 408.236 RSMo.**

10.  Litton serviced the Varns loan from September 1998 to July 1999.  From August 28, 1997 through December 1998, PCC owned the Varns loan.  From on or about January 1999

4

through July 1999, Litton serviced the Varns loan for U.S. Bank National Association N.D. (Ex. D, Declaration of Kevin Flannigan ¶ 9.)

> **RESPONSE: Objection. This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact." Without waiving, and subject to their objections, Plaintiffs will separately address fact below.**

a. **Undisputed.**

b. **Undisputed.**

c. **Undisputed.**

11. Litton did not originate the Varns loan. (*Id.* ¶ 10.)

**RESPONSE: Undisputed.**

12. Litton did not fund the Varns loan. (*Id.* ¶ 11.)

**RESPONSE: Undisputed.**

13. Litton was not a service provider or vendor that assisted with the closing of the Varns loan. (*Id.* ¶ 12.)

> **RESPONSE: Undisputed.**

14. Litton did not assess, collect, or charge any closing costs on the Varns loan at the time it closed. (*Id.* ¶ 13.)

> **RESPONSE: Undisputed.**

15. Litton was never an assignee, owner or holder of the Varns loan. (*Id.* ¶ 14.)

> **RESPONSE: Objection and disputed. This contention constitutes a legal conclusion and not a fact to which Plaintiffs must admit or deny. Litton's status as a "servicer" renders it an "assignee" under federal law.** *See, e.g., CWCapital Asset Mgmt., LLC v. Chicago Properties, LLC,* **610 F.3d 497, 499-501 (7th Cir. 2010).**

16. Litton had no contractual, legal or equitable interest in the Varns loan, note, deed of

trust or real estate securing the loan.  (*Id.* ¶ 15.)

> **RESPONSE: Objection and disputed.  This contention constitutes a legal conclusion and not a fact to which Plaintiffs must admit or deny.**
>
> **Pursuant to the Servicing Agreement between Preferred Credit Corporation and Litton Loan Servicing, Litton has a contractual and legal interest in the loans in the form of the servicing rights to those loans.  Ex. NN (Litton (Flannigan) Deposition, at p. 25-26, 46) ; Ex. OO (Deposition Exhibit 385).**
>
> **Litton's status as a "servicer" renders it an "assignee" with a legal interest in the loan under federal law. *See, e.g., CWCapital,* 610 F.3d at 499-501.**

17.   During the period September 1998 to July 1999, Litton serviced 71 other PCC loans that PCC sold to U.S. Bank National Association N.D. in or about December 1998-January 1999. (*Id.* ¶ 16.)  PCC originated each of the loans prior to September 1998. (Ex. F, Redacted Krueger Table 18 identifying note dates.)

> **RESPONSE:  Objection.  This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact." Without waiving, and subject to their objections, Plaintiffs will separately address fact below.**
>
> **a.      Undisputed.**
>
> **b.      Undisputed.**

18.   Litton did not originate any of the 71 other loans.  (Ex. D, Declaration of Kevin Flannigan ¶ 17.)

> **RESPONSE:  Undisputed.**

19.   Litton did not fund any of the 71 other loans.  (*Id.* ¶ 18.)

> **RESPONSE:  Undisputed.**

20.   Litton was not a service provider or vendor that assisted with the closing of the 71 other loans.  (*Id.* ¶ 19.)

**RESPONSE: Undisputed.**

21.   Litton did not assess, collect or charge any closing costs in connection with any of the 71 other loans at the time the loans closed.)  (*Id.* ¶ 20.)

**RESPONSE: Undisputed.**

22.   Litton was never an assignee, owner, or holder of the 71 other loans.  (*Id.* ¶ 21.)

**RESPONSE:   Objection and disputed.   This contention constitutes a legal conclusion and not a fact to which Plaintiffs must admit or deny.   Litton's status as a "servicer renders it an "assignee" under federal law. *See, e.g., CWCapital* 610 F.3d at 499-501.**

23.   Litton had no contractual, legal or equitable interest in the 71 other loans, notes, deeds of trust or real estate securing the loans.  (*Id.* ¶ 22.)

**RESPONSE:   Objection and disputed.   This contention constitutes a legal conclusion and not a fact to which Plaintiffs must admit or deny.**

**Pursuant to the Servicing Agreement between Preferred Credit Corporation and Litton Loan Servicing, Litton has a contractual and legal interest in the loans in the form of the servicing rights to those loans.  Ex. NN (Litton (Flannigan) Deposition, at p. 25-26, 46) ; Ex. OO (Deposition Exhibit 385).**

**Litton's status as a "servicer" renders it an "assignee" with a legal interest in the loan under federal law. *See, e.g., CWCapital*, 610 F.3d at 499-501.**

24.   Plaintiffs have settled the Varns's and class members' claims involving the 72 PCC loans sold to U.S. Bank National Association N.D., including 100% of the alleged unauthorized loan fees.  (Ex. G, motion for preliminary approval of settlement at p. 4 and redacted schedule 2.)

**RESPONSE:   Disputed. The Settlement is limited to the claims of the U.S. Bank Direct Loans Settlement Class" against the Settling Defendants, U.S. Bank, N.A., N.D. and U.S. Bank, as the purchaser, assignee, owner, holder and servicer of certain loans.  See Defendant's Ex. G, motion for preliminary approval of settlement at p. 4 and redacted schedule 2.)  The settlement does not include or release any claims in this lawsuit prior to the acquisition of the loans by either U.S. Bank N.A, N.D. or U.S. Bank.   All claims against Litton as a servicer prior to the date that either U.S. Bank N.A, N.D. or U.S. Bank acquired the loans were reserved and not settled. Those claims against Litton Loan Servicing in this lawsuit for the time frame**

prior to the acquisition remain. See the release provisions in the direct loan settlement and the provision in the U.S. Bank Direct Loans settlement and the Trust Loan Settlement. See Ex. QQQ and Ex. RRR

25. Named plaintiffs Joseph and Amy Black obtained their loan from PCC on July 14, 1998. (Seventh Amended Complaint, Dkt. No. 258 ¶ 258.) Plaintiffs allege "on information and belief" that PCC charged them unauthorized closing fees at the time their loan closed. (*Id.* ¶ 264.)

**RESPONSE: Objection. This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact." Without waiving, and subject to their objections, Plaintiffs will separately address fact below.**

**a. Undisputed for purposes of this motion.**

**b. Undisputed, but qualified to clarify that Plaintiffs and the Class Members seek to recover both (a) the fees that were "directly or indirectly charged, contracted for or received in connection with" their second mortgage loan in violation of § 408.233.1 RSMo, and (b) the interest that was collected and recovered on those loans in violation of § 408.236 RSMo. See also Response to Defendant's Fact No. 26 (below).**

26. There is no evidence that the Blacks actually paid or were charged any fees that were not permitted by Missouri law. (Ex. H, Deposition of Amy Black at p. 31:11-15; pp. 40:25-41:8, Ex. D, Declaration of Kevin Flannigan ¶ 31.)

**RESPONSE: Disputed. Plaintiffs have produced the calculations and amended expert report of Dr. Kurt V. Krueger. *See* Doc. 704, Ex. L-1. Dr. Krueger was retained by Plaintiffs to provide expert economic opinions that include computing statutory damages related to Defendants' alleged violation of the SMLA relating to second mortgage loans obtained by the Plaintiffs, and to calculate to a reasonable mathematical and economic certainty the illegal fees charged, contracted for, or received on those loans for which the Defendants did not provide fee data. To do this Dr. Krueger reviewed the loan parameters for loans with missing data and confirmed that the available data was accurate. [Doc. 704, Ex. L-1 at 29:13-30:19]. Dr. Krueger then analyzed the frequency and occurrence of the allegedly illegal fees and determined the data was homogenous – or there was commonality in the data. [Id. at 83:3-16, 84:10-86:8]. Because the loan data was homogenous Dr. Krueger was**

8

**able to use that data to arrive at statistical estimates for missing fee data, including the Blacks. [Doc. 704, Ex L-1] Dr. Krueger then performed a regression analysis and was able to conclude with 95% confidence, and to a reasonable degree of mathematical and economic certainty that his damages calculations for loans with missing fee data were accurate and that fees not among those listed as permissible fees enumerated in §408.233.1 RSMo, more likely than not, were charged, contracted for or received in connection with each of the loans for which fee data was not supplied. [Id; Doc. 704, UF, ¶36]**

**Plaintiffs' analysis of the HUD-1 Settlement Statements and other loan documents for PCC loans evidences that that a "processing" fee and an "underwriting" fee were assessed in connection with each of the loans. Exhibit EE (Second Declaration of C. Gumbs), at ¶6; Doc. 704, AF ¶29; see also Doc. 704, AF ¶¶26, 27.**

**Also, Plaintiffs' have provided Defendants with the testimony of PCC's executive vice president, who testified that PCC habitually and routinely charged fees that Plaintiffs claim were not authorized by the MSMLA. See Doc. 704, AF ¶¶28.**

27.  Litton serviced the Black loan from September 1998 until it was paid off in July 2002. (Ex. D, Declaration of Kevin Flannigan ¶ 23.)

**RESPONSE:  Undisputed.**

28.  In addition to the Blacks, Litton serviced 7 other loans from September 1998 until the loans were paid off.  (*Id.* ¶ 24.)  Litton serviced the following loans for the identified periods of time:

| Plaintiff | Note Date | Litton Service Dates |
|---|---|---|
| Black (Joseph and Amy) | 7/14/1998 | 9/5/1998 – 7/5/2002 |

| Class Member | Note Date | Litton Service Dates |
|---|---|---|
| Campbell (Howard & Angela) | 6/20/1997 | 9/5/1998 – 10/28/1998 |
| Casals (Michael & Maureen) | 9/27/1997 | 9/5/1998 – 11/10/1998 |
| Cauthon (Beverly) | 9/22/1997 | 9/5/1998 – 4/3/2003 |
| Ebert (Stephen & Phyllis) | 7/22/1998 | 9/5/1998 – 5/8/2000 |
| Henthorn (Michael & Cecelia) | 8/9/1997 | 9/5/1998 – 10/29/1998 |
| Priest (Donald & Jeanette) | 3/13/1997 | 9/5/1998 – 1/5/1999 |
| Raynor (Guy & Jeri) | 10/3/1997 | 9/5/1998 – 3/16/2001 |

(Id. ¶ 24; see also Ex. F, identifying note dates.)

**RESPONSE: Undisputed. In addition and for clarification Litton also serviced from September 1998 to July 1990 71 other PCC loans. See Litton's SOF #17 above.**

29.     Litton did not originate or make the Blacks' loan.  (*Id.* ¶ 25.)

**RESPONSE: Undisputed**

30.     Litton did not fund the Blacks' loan.   (*Id.* ¶ 26.)

**RESPONSE: Undisputed.**

31.     Litton was not a service provider or vendor that assisted with the closing of the Blacks' loan.  (*Id.* ¶ 27.)

**RESPONSE: Undisputed.**

32.     Litton did not assess, collect or charge any closing costs on the Blacks' loan at the time it closed.  (*Id.* ¶ 28.)

**RESPONSE: Undisputed.**

33.     Litton was never an assignee, owner or holder of the Blacks' loan.  (*Id.* ¶ 29.)

**RESPONSE: Objection and disputed. This contention constitutes a legal conclusion and not a fact to which Plaintiffs must admit or deny. Litton's status as a "servicer renders it an "assignee" under federal law. *See, e.g., CWCapital*, 610 F.3d at 499-501.**

34.     Litton had no contractual, legal or equitable interest in the Blacks' loan, note, deed of trust or real estate securing the loan.  (*Id.* ¶ 30.)

**RESPONSE: Objection and disputed. This contention constitutes a legal conclusion and not a fact to which Plaintiffs must admit or deny.**

**Pursuant to the Servicing Agreement between Preferred Credit Corporation and Litton Loan Servicing, Litton has a contractual and legal interest in the loans in the form of the servicing rights to those loans. Ex. NN (Litton (Flannigan) Deposition, at p. 25-26, 46); Ex. OO (Deposition Exhibit 385).**

**Litton's status as a "servicer" renders it an "assignee" with a legal interest in the loan under federal law.** *See, e.g., CWCapital*, **610 F.3d at 499-501.**

35.     Litton did not originate or make the Cauthon, Campbell, Casels, Ebert, Henthorn, Priest or Raynor loans. (*Id.* ¶ 32.)

**RESPONSE: Undisputed.**

36.     Litton did not fund the Cauthon, Campbell, Casels, Ebert, Henthorn, Priest or Raynor loans. (*Id.* ¶ 33.)

**RESPONSE: Undisputed.**

37.     Litton was not a service provider or vendor that assisted with the closing of the Cauthon, Campbell, Casels, Ebert, Henthorn, Priest or Raynor loans. (*Id.* ¶ 34.)

**RESPONSE: Undisputed.**

38.     Litton did not assess, collect or charge any closing costs on the Cauthon, Campbell, Casels, Ebert, Henthorn, Priest or Raynor loans at the time they closed. (*Id.* ¶ 35.)

**RESPONSE: Undisputed.**

39.   Litton was never an assignee, owner or holder of the Cauthon, Campbell, Casels, Ebert, Henthorn, Priest or Raynor loans. (*Id.* ¶ 36.)

**RESPONSE: Objection and disputed. This contention constitutes a legal conclusion and not a fact to which Plaintiffs must admit or deny. Litton's status as a "servicer renders it an "assignee" under federal law.** *See, e.g., CWCapital*, **610 F.3d at 499-501.**

40.   Litton had no contractual, legal or equitable interest in the Cauthon, Campbell, Casels, Ebert, Henthorn, Priest or Raynor loans, notes, deeds of trust or real estate securing the

loans.  (*Id.* ¶ 37.)

> **RESPONSE: Objection and disputed.  This contention constitutes a legal conclusion and not a fact to which Plaintiffs must admit or deny.**
>
> **Pursuant to the Servicing Agreement between Preferred Credit Corporation and Litton Loan Servicing, Litton has a contractual and legal interest in the loans in the form of the servicing rights to those loans.  Ex. NN (Litton (Flannigan) Deposition, at p. 25-26, 46) ; Ex. OO (Deposition Exhibit 385).**
>
> **Litton's status as a "servicer" renders it an "assignee" under federal law. *See, e.g., CWCapital*, 610 F.3d at 499-501.**

41.  Class members Ebert, Cauthon, Campbell, Casels and Henthorn cannot establish that they were charged, financed or paid any fees associated with their respective PCC second mortgage loans or, even if so, that any fees were prohibited by the MSMLA.  (*Id.* ¶ 38.)

> **RESPONSE:  Disputed.  Plaintiffs have produced the calculations and amended expert report of Dr. Kurt V. Krueger. *See* Doc. 704, Ex. L-1. Dr. Krueger was retained by Plaintiffs to provide expert economic opinions that include computing statutory damages related to Defendants' alleged violation of the SMLA relating to second mortgage loans obtained by the Plaintiffs, and to calculate to a reasonable mathematical and economic certainty the illegal fees charged, contracted for, or received on those loans for which the Defendants did not provide fee data. To do this Dr. Krueger reviewed the loan parameters for loans with missing data and confirmed that the available data was accurate. [Doc. 704, Ex. L-1 at 29:13-30:19]. Dr. Krueger then analyzed the frequency and occurrence of the allegedly illegal fees and determined the data was homogenous – or there was commonality in the data. [Id. at 83:3-16, 84:10-86:8]. Because the loan data was homogenous Dr. Krueger was able to use that data to arrive at statistical estimates for missing fee data, including the Blacks. [Doc. 704, Ex L-1] Dr. Krueger then performed a regression analysis and was able to conclude with 95% confidence, and to a reasonable degree of mathematical and economic certainty that his damages calculations for loans with missing fee data were accurate and that fees not among those listed as permissible fees enumerated in §408.233.1 RSMo, more likely than not, were charged, contracted for or received in connection with each of the loans for which fee data was not supplied. [Id; Doc. 704, UF, ¶36]**
>
> **Plaintiffs' analysis of the HUD-1 Settlement Statements and other loan documents for PCC loans evidences that that a "processing" fee and an "underwriting" fee were assessed in connection with each of the loans.  Exhibit EE (Second Declaration of C. Gumbs), at ¶6; Doc. 704, AF ¶29; see also Doc. 704, AF ¶¶26, 27.**

12

**Also, Plaintiffs' have provided Defendants with the testimony of PCC's executive vice president, who testified that PCC habitually and routinely charged fees that Plaintiffs claim were not authorized by the MSMLA. See Doc. 704, AF ¶¶28.**

42.  Litton was not the loan servicer and had or has no connection or relation to any claim of named plaintiffs Michael and Shellie Gilmor, Michael and Lois Harris, Leo Parvin, Mark and Thomasina Shipman, William and Marion Jones, Bruce and Mary James, Kevin and Susan Schaefer, David and Nicole Warkentien, John and Jeanne Rumans, Patricia Ann Worthy, Derrick and Alethia Rockett, William and Carole Hudson, James and Kathleen Woodward, Jeffrey Weathersby and Debra Mooney.  (*Id.* ¶ 39.)

**RESPONSE:  Undisputed.**

43.  Litton did not and does not accept or loan money on deposits or pledges, nor is it authorized to do so.  (*Id.* ¶ 40.)

**RESPONSE:  Objection and disputed.  This contention constitutes a legal conclusion and not a fact to which Plaintiffs must admit or deny. The interpretation of Missouri law is for the Court to decide.**

**Litton Loan Servicing, LP was exempted from licensing under Missouri's Residential Mortgage Brokers License Act, at §443.803(8)(j) RSMo because it was a "mortgage banker" as defined by Missouri law.  *See* Exhibit PP-1; AF ¶2 (below); Def.'s Ex. L, at p. 11, §3.01(d); Def.'s Ex. M, at, p.53, §2.05(iii).**

44.  Litton did not and does not issue or make insurance, nor is it authorized to do so.  (*Id.* ¶ 41.)

**RESPONSE:  Undisputed for purposes of this Motion.**

45.  Litton did not and does not have banking powers, nor is it authorized to exercise banking powers.  (*Id.* ¶ 42.)

**RESPONSE:  Objection and disputed.  This contention constitutes a legal**

conclusion and not a fact to which Plaintiffs must admit or deny. The interpretation of Missouri law is for the Court to decide.

**Litton Loan Servicing, LP was exempted from licensing under Missouri's Residential Mortgage Brokers License Act, at §443.803(8)(j) RSMo because it was a "mortgage banker" as defined by Missouri law.** *See* **Exhibit PP-1; AF ¶2 (below); Def.'s Ex. L, at p. 11, §3.01(d); Def.'s Ex. M, at, p.53, §2.05(iii).**

## II.  ADDITIONAL UNDISPUTED FACTS PRECLUDING THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANT LITTON LOAN SERVICING

1.  Plaintiffs incorporate and restate as though fully set forth herein, each of the Undisputed Facts, and the materials in support of those facts, as submitted in support of Plaintiffs' Motion for Partial Summary Judgment (Doc. 704, UF, ¶¶1-118) as an additional undisputed facts precluding the entry of the various summary judgments that Defendant Litton seeks.

2.  Litton Loan Servicing, LP was exempted from licensing under Missouri's Residential Mortgage Brokers License Act, at §443.803(8)(j) RSMo in September 2000, having been approved as a HUD/FHA approved mortgage lender on or about October 7, 1997 and September 8, 1988.  **Exhibit PP-1** (Missouri Division of Finance Correspondence); *see also* **Exhibit NN** (Litton (Flannigan) Deposition), at p. 27; Def.'s Ex. L, at p. 11, §3.01(d); Def.'s Ex. M, at, p.53, §2.05(iii).

3.  Litton began servicing a total of 80 Class Members' loans in September 1998 following a transfer of servicing from Advanta.  **Exhibit NN** (Litton (Flannigan) Deposition), at p. 14, 32, 70; Def.'s Ex. K.

4.  At the time of the transfer of the 80 loans, Litton acquired the servicing rights to those loans.  **Exhibit NN** (Litton (Flannigan) Deposition), at p. 51.

5.  Litton serviced 72 loans for U.S. Bank, N.A., N.D.  **Exhibit NN** (Litton (Flannigan)

Deposition), at p. 17-18, 45-4, 71-72; **Exhibit OO** (Depo. Exhibit 385).

6. Litton serviced the 72 loans for U.S. Bank until July 1999 when an entity called U.S. Bank, N.A. became the servicer of the loans for the owner, which was U.S. Bank, National Association North Dakota. **Exhibit NN** (Litton (Flannigan) Deposition), at p. 71-72.

7. Litton serviced four loans for the C-BASS Trust 2000-CB2. **Exhibit NN** (Litton (Flannigan) Deposition), at p. 17-18, 21-22, 42; **Exhibit QQ** (Depo. Exhibit 358).

8. Litton serviced four Class member loans on behalf of unknown investors. **Exhibit NN** (Litton (Flannigan) Deposition), at p. 17-18, 22.

9. At the time it acquired the servicing rights to the 80 loans, Litton undertook no effort to determine whether those loans were originated in compliance with Missouri law. **Exhibit NN** (Litton (Flannigan) Deposition), at p. 38-39.

10. At the time it acquired the servicing rights to the 80 loans, Litton undertook no effort to confirm or verify whether Missouri law allowed interest to be charged in connection with those loans. **Exhibit NN** (Litton (Flannigan) Deposition), at p. 38-39.

11. At no time during the servicing of the 80 Class members' loans did Litton conduct or hire any entities to perform any compliance reviews or any reviews of the origination of the loans in connection with its servicing of the loans. **Exhibit NN** (Litton (Flannigan) Deposition), at p. 89.

12. In connection with its servicing of the 80 loans, Litton received the monthly loan payments from the borrowers. **Exhibit NN** (Litton (Flannigan) Deposition), at p. 50-52, 53.

13. In connection with its servicing of the 80 loans, Litton sent monthly loan statements to the borrowers that charged them for payments that were due. **Exhibit NN** (Litton (Flannigan) Deposition), at p. 53.

14.   In connection with its servicing of the 80 loans, Litton remitted the monthly loan payments received from each of the borrowers to the trustee.  **Exhibit NN** (Litton (Flannigan) Deposition), at p. 50.

15.   In connection with its servicing of the 80 loans, the trustee distributed the monies received from the borrowers on their monthly loan payments to the certificate holders and investors.  **Exhibit NN** (Litton (Flannigan) Deposition), at p. 50.

16.   In connection with its servicing of the Class Member's loans, Litton annually issued IRS Form 1098's to the Class members.  **Exhibit NN** (Litton (Flannigan) Deposition), at p. 53.

17.   In the IRS Form 1098 for 2002, Litton Loan Servicing is identified as the recipient of $7,096.24 in interest from Beverly Cauthon.  **Exhibit RR** (Depo. Ex. 386).

18.   In the IRS Form 1098 for 2003, Litton Loan Servicing is identified as the recipient of $2,272.31 in interest from Beverly Cauthon.  **Exhibit RR** (Depo. Ex. 386); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 54-57.

19.   In the Litton Loan Servicing Detail Transaction History for Beverly Cauthon, Litton Loan Servicing is identified as the recipient of $49,646.09 in principal and $33,806.69 in interest during the life of the loan.  **Exhibit SS** (Depo. Ex. 388); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 59; 64-65

20.   In the Litton Loan Servicing Detail Transaction History for Edward and Angela Campbell, Litton Loan Servicing is identified as the recipient of $41,174.31 in principal and $1,843.54 in interest during the life of the loan.  **Exhibit TT** (Depo. Ex. 389); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 64-65; 68-69

21.   In the Litton Loan Servicing Detail Transaction History for Michael and Maureen Casals, Litton Loan Servicing is identified as the recipient of $31,368.09 in principal and

$1,002.13 in interest during the life of the loan. **Exhibit UU** (Depo. Ex. 390); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 64-65, 73-74

22.    In the Litton Loan Servicing Detail Transaction History for Michael and Cecilia Henthorn, Litton Loan Servicing is identified as the recipient of $24,785.01 in principal and $ 639.28in interest during the life of the loan. **Exhibit VV** (Depo. Ex. 391); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 64-65

23.    In the Litton Loan Servicing Detail Transaction History for Donald and Jeannette Priest, Litton Loan Servicing is identified as the recipient of $27,928.43 in principal and $1,422,57 in interest during the life of the loan. **Exhibit WW** (Depo. Ex. 392); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 64-65

24.    In the Litton Loan Servicing Detail Transaction History for Joseph and Amy Black, Litton Loan Servicing is identified as the recipient of $34,412.00 in principal and $18,121.69 in interest during the life of the loan. **Exhibit XX** (Depo. Ex. 393); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 64-65; 76-77

25.    In the IRS Form 1098 for 2002, Litton Loan Servicing is identified as the recipient of $3,279.13 in interest from Joseph and Amy Black. **Exhibit XX** at LLS00033 (Depo. Ex. 393); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 81

26.    In the Litton Loan Servicing Detail Transaction History for Stephen and Phyllis Ebert, Litton Loan Servicing is identified as the recipient of $38,345.61 in principal and $8,203.15 in interest during the life of the loan. **Exhibit YY** (Depo. Ex. 394); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 64-65; 84

27.    In the Litton Loan Servicing Detail Transaction History for Guy and Jeri Raynor, Litton Loan Servicing is identified as the recipient of $28,867.55 in principal and $10,247.98 in

interest during the life of the loan. **Exhibit ZZ** (Depo. Ex. 395); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 64-65, 85

28. Litton Loan Servicing was paid a "Servicing Fee" which was calculated as a percent of as a set "basis points" of the principal loan balance and were deducted from the "the interest portion of the Monthly Payment received from the related Mortgagor." **Exhibit OO** (Depo. Ex. 385, at Definitions for "Servicing Fee," "Standard Servicing Fee Rate" and "Special Servicing Fee Rate," Section 6.03(a), and Exhibit D); **Exhibit NN** (Litton (Flannigan) Deposition), at p. 75-76.

29. The calculations and amended expert report of Dr. Kurt V. Krueger concludes that each of the borrower-class members more likely than not, were charged, contracted for, or received in connection with each of the loans for which fee data was not supplied. **[Id; Doc. 704, UF, ¶36]** including, but not limited to, loan processing fees, mortgage broker fees, and underwriting fees. **Doc. 704, Ex. L-1**.

30. Dr. Krueger was retained by Plaintiffs to provide expert economic opinions that include computing statutory damages related to Defendants' alleged violation of the SMLA relating to second mortgage loans obtained by the Plaintiffs, and to calculate damages related to alleged violations of the Home Owner's Equity Protection Act ("HOEPA"). To do this Dr. Krueger reviewed the loan parameters for loans with missing data and confirmed that the available data was accurate. **[Doc. 704, Ex. L-2 at 29:13-30:19].** Dr. Krueger then analyzed the frequency and occurrence of the allegedly illegal fees and determined the data was homogenous – or there was commonality in the data. [Id. at 83:3-16, 84:10-86:8]. Because the loan data was homogenous Dr. Krueger was able to use that data to arrive at statistical estimates for missing fee data, including class members, Ebert, Cauthon, Campbell, Casels and Henthorn. **[Doc. 704,**

**Ex L-1]** Dr. Krueger then performed a regression analysis and was able to conclude with 95% confidence, and to a reasonable degree of mathematical and economic certainty that his damages calculations for loans with missing fee data were accurate. *See* **Doc. 704, Ex. L-1 at 3.**

31.     Plaintiffs' analysis of the HUD-1 Settlement Statements and other loan documents for PCC loans evidences that that a "processing" fee and an "underwriting" fee were assessed in connection with each of the loans. **Exhibit EE** (Second Declaration of C. Gumbs), at ¶6; AF ¶31; Doc. 704, AF ¶29; see also Doc. 704, AF¶¶26, 27.

32.     PCC's executive vice president testified that PCC habitually and routinely charged fees that Plaintiffs claim were not authorized by the MSMLA. See Doc. 704, AF ¶¶28.

33.     The HUD-1 Settlement Statement for Donald and Jeanette Priest identifies that the following fees were charged, contracted for and received in connection with their loan:

| Line No. | Description | Identified Payee | Amount |
| --- | --- | --- | --- |
| 803 | Appraisal Fee | Pre Irvine/PFS | $250.00 |
| 807 | Mortgage Broker Fee | Pre Irvine/PFS | $2,750.00 |
| 808 | Document Prep | Preferred | $125.00 |
| 809 | Loan Processing | Preferred | $395.00 |
| 810 | Underwriting Fee | Preferred | $125.00 |
| 812 | Sub Escrow/App | Preferred | $190.00 |
| 813 | Doc Signing Fee | Preferred | $150.00 |
| 814 | Processing Fee | Pre Irvine/PFS | $450.00 |
| 901 | Interest | | ($11.29) |
| 1108 | Title Insurance | Preferred | $250.00 |
| 1201 | Recording Fee | | $48.00 |

**Exhibit BBB.**

34.     The HUD-1 Settlement Statement for the loan of Guy and Jeri Raynor identifies that the following fees were charged, contracted for and received in connection with their loan:

| Line No. | Description | Identified Payee | Amount |
|---|---|---|---|
| 807 | Mortgage Broker Fee | PRE IRVINE/PFS | $584.00 |
| 809 | Loan Processing | Preferred Credit Corporation | $395.00 |
| 810 | Underwriting Fee | Preferred Credit Corporation | $125.00 |
| 812 | Administrative Document Fee | Preferred Credit Corporation | $500.00 |
| 813 | App Review/Doc Signing | Preferred Credit Corporation | $235.00 |
| 815 | Admin/Processing Fee | PRE IRVINE/PFS | $2,766.00 |
| 901 | Interest | | $167.85 |

**Exhibit AAA.**

35.     In connection with its servicing of the 80 Class Members' loans, Litton received an interest payment from every single loan after March 3, 1998.  (Ex. EEE ¶ 4 CMG Affidavit Litton)(UF ¶ 28).

36.   In connection with its servicing of the 80 Class Members' loans, Litton received an interest payment from at least three (3) loans after March 3, 2001.  (Ex. EEE ¶ 4 CMG Affidavit Litton)(UF ¶ 28).

## III.   ARGUMENTS AND LEGAL AUTHORITIES

### A.     SUMMARY JUDGMENT STANDARD.

The Court is familiar with the summary judgment standards. Plaintiffs do set forth those standards in their *Suggestions in Opposition to Defendant Wilmington Trust Company's Motion for Summary Judgment ("Plaintiffs' Suggestions in Opposition to WTC")* and, for brevity's sake, will incorporate that same briefing as though it were fully set forth herein.

### B.     A REASONABLE JURY CAN READILY CONCLUDE THAT THE LOANS LITTON ADMITTEDLY SERVICED VIOLATED THE MSMLA IN THAT ONE OR MORE FEES NOT AUTHORIZED BY THE MSMLA WAS CHARGED, CONTRACTED FOR OR RECEIVED IN CONNECTION WITH THE CLASS MEMBERS' LOANS.

Litton challenges Plaintiffs' ability to show that six (6) of the eighty (80) PCC-originated

second mortgage loans that Litton serviced violated the MSMLA as alleged.

Plaintiffs have addressed PCCs origination of the Class members' loan in their Motion for Partial Summary Judgment and related Suggestions in Support and demonstrated why those loans violate the MSMLA. *See* Doc. 703-704; Doc. 704, AF ¶¶1-2, 6, 19, 26-30, 36  As they did in their Suggestions in Opposition to WTC's Motion for Summary Judgment, Plaintiffs again demonstrate with respect to the 80 Litton Loans that PCC charged, contracted for or received at least one or more fees not authorized by §408.233.1.  **(R-UF ¶¶26, 41; AF ¶¶29-32)**  Because the arguments that Plaintiffs make in support of their Motion for Partial Summary Judgment (Doc. 703-704) and in opposition to each of the Defendants' related Motions for Summary Judgment are the same Plaintiffs will incorporate that briefing in response to Litton's Motion for Summary Judgment.

With respect to the six (6) class member loans that Litton claims Plaintiffs lack evidence demonstrating that the loans contained illegal fees, Plaintiffs' incorporated briefing demonstrates that direct, circumstantial and expert opinion evidence shows that PCC consistently charged, contracted for or received one or more fees in violation of § 408.233.1 RSMo.  **(R-UF ¶¶26, 41; AF ¶¶29-32)**  Indeed, Plaintiffs' analysis of the HUD-1 Settlement Statements and other loan documents for PCC loans evidences that that a "processing" fee and an "underwriting" fee were assessed in connection with each of the loans.  Exhibit EE (Second Declaration of C. Gumbs), at ¶6; AF ¶31; Doc. 704, AF ¶29; *see also* Doc. 704, AF¶¶26,  Also, PCC's executive vice president testified that PCC habitually and routinely charged fees that Plaintiffs claim were not authorized by the MSMLA. *See* Doc. 704, AF ¶¶32.  Further, Plaintiffs' expert, Dr. Kurt V. Krueger reviewed the loan parameters for loans with missing data and confirmed that the available data was accurate.  **[Doc. 704, Ex. L-2 at 29:13-30:19]**.  Dr. Krueger then analyzed the

frequency and occurrence of the allegedly illegal fees and determined the data was homogenous – or there was commonality in the data. **[Id. at 83:3-16, 84:10-86:8].** Because the loan data was homogenous Dr. Krueger was able to use that data to arrive at statistical estimates for missing fee data, including the Blacks. **[Doc. 704, Ex L-1]** Dr. Krueger then performed a regression analysis and was able to conclude with 95% confidence, and to a reasonable degree of mathematical and economic certainty that his damages calculations for loans with missing fee data were accurate and that fees not among those listed as permissible fees enumerated in §408.233.1 RSMo, more likely than not, were charged, contracted for or received in connection with each of the loans for which fee data was not supplied. **[Id; Doc. 704, UF, ¶36]**

Based on this incorporated briefing, and the facts and evidence, Plaintiffs believe that they have presented a *prima facie* question for the jury whether the loans that Litton admittedly serviced violated the MSMLA because one or more fees not authorized by §408.233.1 RSMo was charged, contracted for or received in connection with the loans.

### C.    PLAINTIFFS' MSMLA CLAIMS AGAINST LITTON ARE NOT TIME-BARRED.

Litton asserts that all of the MSMLA claims being asserted against it are barred by the three-year statute of limitations prescribed in § 516.130(2) RSMo. The Court should reject this argument and again hold that the six-year statute provided in §516.420 applies to Plaintiffs' MSMLA claims against a "moneyed corporation" like Litton.

### 1.    The Six-Year Statute Provided in § 516.420 Applies to Plaintiffs' MSMLA Claims Against a "Moneyed Corporation" like Litton.

Litton relies on the recent decision by the Eighth Circuit in *Rashaw v. United Consumers Credit Union*, 685 F.3d 739 (8th Cir. 2012) as support for its argument the Missouri Supreme Court would overrule *Schwartz v. Bann-Cor Mortgage,* 197 S.W.3d 168 (Mo.App.W.D.2006),

which specifically held that the Plaintiffs' MSMLA claims were governed by the six-year limitations period in §516.420, and hold that §516.420 only applies in instances where there is a criminal prosecution for penalties or forfeitures authorized by criminal statutes." (Doc. 678 at 19). Litton's reliance on *Rashaw* is misplaced.

Litton's argument is essentially identical to the arguments raised by its Co-Defendants on this point. Because Plaintiffs have exhaustively addressed this same argument in their *Suggestions in Opposition to WTC*, Plaintiffs will incorporate their *Suggestions in Opposition to WTC* as though they were fully set forth herein. Based on Plaintiffs' briefing, the Court should *again* hold that the six-year statute provided in § 516.420 applies to the Plaintiffs' MSMLA claims. In *Schwartz*, the Missouri Court of Appeals rejected the argument that the three-year statute in §516.130(2) governs Plaintiffs' claims, and the Missouri Supreme Court allowed that rule of law to stand. The *Rashaw* decision violates the *Erie* doctrine and should not be followed. This Court must make its own independent evaluation of state law and is in no way constrained to follow the *Rashaw* decision's mere "prediction" of Missouri law

### 2. Litton is a "Moneyed Corporation" to Which The Six-Year Statute of Limitations in § 516.420 RSMo Applies as a Matter of Law.

Litton like PCC and Wendover and all of the other financial businesses involved in this case, is a "moneyed corporation" for purposes of § 516.420. In *Schwartz*, the Missouri Court of Appeals held that the term "moneyed corporations" includes "real estate mortgage lenders" and was not limited "only to lenders who secure loans with deposits and chattel mortgages." *Schwartz*, 197 S.W.2d at 175-77 (construing language of § 516.420 "in its ordinary sense" and concluding that "the statutory purposes are best fulfilled by holding that all banks, insurers, and finance companies are "moneyed corporations" within the meaning of section 516.420"). A loan servicer similarly fits the bill.

Litton was at all relevant times a financial services company engaged in the business of servicing residential mortgage loans. (AF, ¶2) During the time that it was engaged in its loan servicing operations in Missouri, Litton was a "mortgage banker" subject to regulation by the Missouri Division of Finance. By law, the Missouri Division of Finance has "charge" of the laws "*relating to banks, trust companies, and the banking businesses of the state*." § 361.020.1 RSMo 2000 (emphasis added).

All entities and persons that "engage in the business of brokering, funding, originating, *servicing* or purchasing of residential mortgage loans" in Missouri are subject to Chapter 443 of the Missouri Revised Statutes. *See* § 443.805.1 RSMo 2000; §§ 443.800 to 443.893 RSMo 2000. State regulation is substantial. *See, e.g.*, § 443.812.2 RSMo ("[l]icenses may only solicit broker, fund, originate, service and purchase residential mortgage loans in conformance with sections 443.800 to 443.893 and such rules as may be promulgated by the director thereunder"); § 443.827 RSMo (requisite averments that must accompany license application); § 443.855 RSMo (regulation of advertising); § 443.861 RSMo (servicing of loans – transfer or sale); § 443.885 RSMo (annual report of mortgage activity). Because it is indisputably subject to such regulation, Litton irrefutably had "banking powers."

A loan servicer/mortgage banker like Litton can be exempted from the Missouri state licensing provisions if it falls within an exemption set forth in §443.803.1(8) RSMo. That exemption, at § 443.801.3(8)(j) RSMo 2000, only applied if the servicer remained subject to federal banking laws. *See* § 443.801.1(19) RSMo, which provides:

> "a mortgage loan company which is subject to licensing, supervision, or annual audit requirements by the Federal National Mortgage Association (FNMA), or the Federal Home Loan Mortgage Corporation (FHLMC), or the United States Veterans Administration (VA), or the United States Department of Housing and Urban Development (HUD), or a successor of any of the foregoing agencies or entities, as an approved lender, loan correspondent, seller, or servicer."

§443.908.1(19) RSMo (2000).

Indeed, in September 2000 Litton obtained a licensing exemption pursuant to §443.803(8)(j) from the Division of Finance. (AF, ¶2) That licensing exemption was provided to Litton as a "mortgage banker" that had been approved as a HUD/FHA approved mortgage lender on or about October 7, 1997 and September 8, 1988. (AF, ¶2) With that license exemption, Litton was still a "financial institution" subject to regulation by the Missouri Division of Finance as:

> A mortgage loan company or mortgage banker doing business under the laws of this state or the United States which is subject to licensing, supervision, or auditing by the Federal National Mortgage Association, or the Federal Home Loan Mortgage Corporation, or the United States Veterans' Administration, or the Government National Mortgage Association, or the United States Department of Housing and Urban Development, or a successor of any of the foregoing agencies or entities, as an approved seller or servicer, if their principal place of business is in Missouri or a state which is contiguous to Missouri;

§ 381.410(b) RSMo.

Thus, Litton was subject to regulation by the Missouri Division of Finance as a financial instruction and mortgage banker. The Missouri Division of Finance provided Litton with a licensing exemption because it was also subject to comparable federal regulation. Litton was also subject to federal "banking law." The operation of residential mortgage loan servicers like Litton is governed by various chapters of the federal banking law under Title 12 of the United States Code, governing "Banks and Banking," with which Litton had to comply (as is shown by the loan papers): Title 12 of the United States Code including, among other things, Chapters 27 (Real Estate Settlement Procedures Act), 29 (mortgage disclosures), 35 (Right to Financial Privacy); 38 and 38A (mortgage foreclosures), 49 (Homeowners' Protection Act of 1998); 52 (Wall Street Reform and Consumer Protection; Home Affordable Mortgage Program).

25

In support of its motion for summary judgment, Litton argues that it fails to come within the definition of "moneyed corporation" set forth in Court of Appeals' decision in *Div. of Labor Standards v. Walton Constr. Mgmt. Co., Inc.*, 984 S.W.2d 152 (Mo.App.W.D. 1998). In *Walton Construction*, the Court of Appeals defined "moneyed corporations" as those "having banking powers, or having the power to make loans upon pledges or deposits, or authorized by law to make insurance." *Id.* at 156. Based on this record, the Court should conclude that a mortgage servicing company like Litton is a "moneyed corporation" within the meaning of §516.420. Litton has "banking powers" and is a "moneyed corporation" under Missouri law pursuant to both the *Walton Construction* and *Schwartz* tests as set forth above. The Court should hold that Litton was a "moneyed corporation" for purposes of §516.420.

### 3. Plaintiffs' Claims Are An Action On A Penal Statute.

Litton asserts that Plaintiffs' claims are not an action on a penal statute, and therefore §516.420 does not apply. However, as more fully set forth in *Plaintiffs' Suggestions in Opposition to WTC* at E.1. and which Plaintiffs incorporate and restate as though fully set forth herein, the Court should reject this assertion. The Missouri legislature clearly intended for §§516.380 to 516.420 to apply to civil actions such as Plaintiffs' claims under the MSMLA.

### 4. Even if the Contested Three-Year Statute Applies, Plaintiffs' MSMLA Claims Against Litton are not Barred by Limitations Because Plaintiffs Paid Interest and Principal on their PCC-Made Loans Within the Contested Three-Year Period and a Cause of Action Arising From the Violation of the MSMLA Accrued Each Time Interest and Principal was Charged and Received on the Loans.

Finally, even if the Court concludes, per *Rashaw*, that the contested three-year statute applies, the Court should deny Litton's motion as to the MSMLA claims arising from Litton's loan servicing and hold that Plaintiffs' claims were timely filed at least as to the loan payments for which the Plaintiff-Borrowers were billed and paid on or after March 3, 2001 – within the

contested three-year period preceding the date on which Litton was formally named as a defendant. There are three (3) loans that meet this criteria. **(R-UF ¶28; AF¶¶35-36)**

As to this point, the arguments set forth by Plaintiffs as to Wilmington Trust Company's motion in their *Suggestions in Opposition to WTC* at III.E.2 thoroughly explains why the Court should deny Litton's motion as to the MSMLA claims arising from Litton's loan servicing on or after March 3, 2001 – within the contested three-year period preceding the date on which Litton was formally named as a defendant. Here, the undisputed facts demonstrate that at least 3 of the Class members paid interest and principal on their second mortgage loans to Litton within the three year period prior to the date Litton was formally named as a Defendant in this lawsuit. **(R-UF ¶28; AF¶¶35-36)**

> **D.    A LOAN SERVICER DIRECTLY VIOLATES THE MSMLA WHEN IT EITHER RECOVERS INTEREST PAYMENTS OR CHARGES AND/OR RECEIVES FINANCED LOAN FEES FROM BORROWERS**

Litton seeks summary judgment based on its contention that did not purchase or take an assignment of any loan. Thus, Litton argues that it cannot be liable under a common law assignee theory or under the HOEPA assignee provision of 15 U.S.C. §1641(d). That is a straw man argument because neither of those arguments addresses the basis of liability asserted against the servicer in this case. Plaintiffs do not base their claim of liability as to Litton on its status as an assignee. Instead, Plaintiffs assert that Litton is liable because Litton either (1) collected on or recovered illegal interest on the loans through the monthly interest payments or (2) directly or indirectly charged, contracted or received illegal fees in connection with the loans through its charging or receiving illegal fees through the charging or receipt of monthly principal payments on the loans. Neither of these requires an assignment under the MSMLA and Litton points to no such requirement.

27

**Illegal Interest**

First, the argument inexplicably ignores Litton's liability for the collection or recovery of the illegal interest on the loans. §408.236 RSMo prohibits the collection of "any interest" if a loan was made in violation of the MSMLA, *Mitchell*, 334 S.W.3d at 502-503; *Washington*, 655 F.3d at 874-875; §§408.233.1, 408.236. Plaintiffs paid, and Litton "charged" and "received" an unlawful interest charge as a part of each and every monthly payment. AF ¶¶ 16-27. Litton does not dispute that it serviced the Class members' loans. See R-UF ¶¶, 10, 27, 28, 71. From these undisputed facts, the liability of Litton is direct and indisputable. See also AF ¶¶ 3-8, 12, 13, 35, 36. Litton's conduct in collecting and recovering prohibited interest violated the SMLA. It could not be clearer. In fact in this same scenario in *Mitchell* the jury found the servicer, Homecomings, liable under the MSMLA for the collection and recovery of interest. The result should be no different here. Without question Litton admits the recovery of interest and its liability under the MSMLA is thereby established.

**Financed Illegal Loan Fees**

As *Mitchell* makes clear, the broad consumer protections of the MSMLA subjects loan servicers to liability because they ***directly or indirectly*** violate its provisions. Specifically, § 408.232.1 states "With respect to a second mortgage loan, ***any* person, firm or corporation** may ***charge, contract for, and receive interest in any manner at rates agreed to by the parties*** computed on unpaid balances of the principal for the time actually outstanding." In turn, §408.233.1 states: "***No charge* other than that permitted by section 408.232** shall be ***directly or indirectly charged, contracted for or received*** in connection with any second mortgage loan, except as provided in this section [enumerating specific list of fees]. Next, §408.236 states, in relevant part: "***Any person*** violating the provisions of sections 408.231 to 408.241 ***shall be***

***barred from the recovery of interest on the contract***…" And, §408.562 provides a right of action to "***any person who suffers any loss of money or property as a result of any act, method or practice in violation of the provisions of sections 408.100 to 408.561.***"

The illegal loan fees on which Plaintiffs base their claims were financed as a part of the principal loan amount. Litton, as a loan servicer, "charged" and then "received" an illegal charge prohibited by §408.233.1 and §408.232.1 as a part of the principal portion of each and every monthly payment. *Mitchell*, 334 S.W.3d at 500-502; *accord Mayo,* 763 F.Supp.2d at 1109; §408.233.1. From these facts, the liability of Litton is direct and squarely violates the statutory prohibitions against charging or receiving directly or indirectly illegal fees. See AF ¶¶ 19-224, 26-28 The "charging" or "receipt" of the illegal loan fees by Litton, in and of itself, constituted a violation of §408.233.1. See §§408.233.1, 408.562 RSMo; Mitchell, 334 S.W.3d at 501 ("[t]hrough the disjunctive, [the language of §408.233.1 RSMo ] reaches **even those entities that never received the fees or interest, never charged for them, or never contracted for them**") (emphasis added). Litton must now return and/or repay whatever interest it recovered Litton's motion for summary judgment fails as a matter of law.

Also, as with Wendover, Litton's liability for its "direct" or "independent" violations of the MSMLA is not tied to HOEPA's assignee liability provisions at 15 U.S.C. § 1641(f). Litton's liability is for violations of the MSMLA and those violations are independent "direct" or "indirect" violations and do not rely upon assignee or derivative liability.

There is no basis under Missouri law to grant Litton's motion.

**E.   A REASONABLE JURY CAN READILY CONCLUDE THAT LITTON'S FAILURE TO ASCERTAIN WHETHER THE LOANS IT SERVICED COMPLIED WITH THE MSMLA ENTITLES PLAINTIFFS TO PUNITIVE DAMAGES AGAINST LITTON.**

Litton also asserts that it is entitled to a summary judgment on Plaintiffs' claims for

punitive damages contending that there is no evidence that it acted with reckless disregard or malice with respect to its servicing of the Class members' loans. *See* Doc. 678, at p.22. A reasonable jury might conclude differently and thus the Court should deny Litton's Motion.

Specifically, the undisputed facts demonstrate that Litton made no effort to determine whether the loans it was servicing were originated in compliance with Missouri law or whether its servicing of the loans and collection of interest on the loans was permissible under Missouri law. (**AF ¶9-11**) This is sufficient evidence under *Mitchell* and *Mayo* to put the question of punitive damages to the jury. *See Mitchell*, 334 S.W.3d at 510-11; *Mayo*, 763 F.Supp.2d at 1112 Therefore, the Court should deny Litton's Motion as to Plaintiff's punitive damages claims.

### F. PLAINTIFFS WILL NOT ASSERT A CLAIM AGAINST LITTON FOR CONSPIRACY, JOINT VENTURE OR PARTNERSHIP AT TRIAL.

Plaintiffs will not assert at trial that Litton is liable for any of the statutory violations of PCC or any of the assignees that purchased or received the eighty (80) loans that Litton admittedly serviced based upon a "conspiracy," "joint venture," or partnership . *See* Doc. 678, at 23. Plaintiffs' claims against Litton arise from Litton's conduct and actions as a servicer of those illegal loans and its direct or independent violations of the MSMLA.

### IV. CONCLUSION

The Court should deny Defendant Litton's Motion for Summary Judgment and grant Plaintiffs' cross-motion for Partial Summary Judgment.

Dated: September 24, 2012              Respectfully Submitted,

                                     WALTERS BENDER STROHBEHN
                                           & VAUGHAN, P.C.

                                   By     */s/ Kip D. Richards*
                                         R. Frederick Walters – Mo. Bar 25069
                                         Kip D. Richards – Mo. Bar 39743
                                         David M. Skeens – Mo. Bar 35728
                                         Karen W. Renwick – Mo. Bar 41271
                                         J. Michael Vaughan Mo. – Bar 24989
                                         Garrett M. Hodes – Mo. Bar 50221
                                         Matthew R. Crimmins – Mo. Bar 53138
                                         Bruce V. Nguyen – Mo. Bar 52893
                                       2500 City Center Square
                                         1100 Main Street
                                         P.O. Box 26188
                                         Kansas City, MO 64196
                                         (816) 421-6620
                                         (816) 421-4747 (Facsimile)
                                         fwalters@wbsvlaw.com
                                         krichards@wbsvlaw.com
                                         dskeens@wbsvlaw.com
                                         krenwick@wbsvlaw.com
                                         mvaughan@wbsvlaw.com
                                         ghodes@wbsvlaw.com
                                         mcrimmins@wbsvlaw.com
                                         bnguyen@wbsvlaw.com

                                   ATTORNEYS FOR PLAINTIFFS/
                                   CLASS COUNSEL

## CERTIFICATE OF SERVICE

       The undersigned hereby certifies that on this the 24th day of September 2012, I electronically filed the above and foregoing document with the Clerk of Court of the Western District of Missouri using the Court's ECF system, which will send notification of said filing to all counsel of record who are ECF participants. In addition, a copy was served by U.S. mail, First-Class Postage Prepaid, to:

       Arthur E. Kechijian, Manager
       United Mortgage C.B., LLC
       P.O. Box 471827
       Charlotte, NC 28247

**Defendant United Mortgage C.B., L.L.C**.


_____/s/ R. Frederick Walters_____